UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **EDWON CARTER,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) No. 16 C 2753 |
| v. | ) |
| | ) **Chief Judge Rubén Castillo** |
| **RANDY PFISTER, Warden,** | ) |
| | ) |
| **Respondent.** | ) |

## MEMORANDUM OPINION AND ORDER

Edwon Carter ("Petitioner") is serving a 60-year sentence for a first degree murder

conviction in Illinois. Presently before the Court is his *pro se* petition pursuant to 28 U.S.C.

§ 2254. (R. 1, Pet.) For the reasons stated below, the petition is denied.

## BACKGROUND

This case involves yet another tragic act of violence on the streets of Chicago. In the

early morning hours of June 17, 2006, Petitioner and his friend, Alton Spann, both members of

the Vice Lords street gang, were driving around Chicago's Englewood neighborhood in a tan

sedan. *People v. Carter*, 2011 IL App (1st) 101488-U, 2011 WL 10068567, at *1, *3 (Ill. App.

Ct. Nov. 8, 2011).[1] At that time, the Vice Lords were "at war" with the Black P Stones, a rival

gang with an adjacent territory in Englewood. *Id.* at *3. During the course of the night, Petitioner

and Spann witnessed a shooting involving a fellow gang member; as a result, they decided to

obtain a gun and engage in a shooting themselves. *Id.* They drove to a Vice Lord "stash spot" a

few blocks away, where Petitioner retrieved a .38 caliber revolver owned by the gang. *Id.*

---

[1] In deciding the petition, the Court must presume that the facts set forth by the state courts are correct. 28
U.S.C. § 2254(e)(1). Unless otherwise noted, the facts stated herein are taken directly from the state court
opinions in Petitioner's case.

The two then began driving around the vicinity of 56th Street and Winchester, which was known as Black P Stone territory. *Id.* They saw a group of people sitting on a porch in the middle of the 5600 block of Winchester. *Id.* Spann did not think that they were Black P Stones because the group included women, but Petitioner believed that they were gang members. *Id.*; *People v. Carter*, 2015 IL App (1st) 132584-U, 2015 WL 4606082, at *1 (Ill. App. Ct. July 30, 2015). They drove around the corner and parked their car. *Carter*, 2011 WL 10068567, at *3. They then walked back down the alley and through a gangway in the middle of the block, crouching down in the gangway across the street from the house where the people were gathered. *Id.* Petitioner was holding the gun and Spann was behind him. *Id.* Petitioner then stood up, raised the gun in front of him, pointed it at the porch, and fired several shots. *Id.* at *4. They then ran back to the car, drove back to the stash spot to return the gun, and drove to a friend's house a few blocks away. *Id.* At the house Petitioner told his friend, "I think I got one." *Id.* He was right: One of the people on the porch, Jesse Franklin, was shot twice in the head and later died of his injuries. *Id.* at *1. But Franklin was not in fact a Black P Stones gang member: He was a Virginia resident home on leave from the U.S. Navy celebrating his birthday with family members. (R. 8-5, Trial Tr. at 8, 30.)

Spann and Petitioner were later arrested for the murder. *Carter*, 2011 WL 10068567, at *3. Spann ultimately pled guilty to a reduced charge pursuant to a plea agreement. *Id.* In January 2010, the case against Petitioner proceeded to trial. *Id.* Spann was one of the state's key witnesses, and he testified at length about the events of that evening, describing how Petitioner had shot Franklin. *Id.* Another eyewitness was Timothy Wright, who testified under subpoena by the prosecution. *Id.* at *2. Wright testified that he heard several gunshots that night, but he professed not to recall anything else about what happened. *Id.* He also claimed not to recall being

2

arrested on a drug charge several months after the shooting or telling the police at that time that he had information about a murder. *Id.* He claimed not to remember identifying Petitioner in a photo array or signing a handwritten statement inculpating Petitioner. *Id.* He also claimed not to remember testifying under oath before a grand jury in a manner consistent with his statement to police. *Id.*

Wright was then impeached with the statement he gave to police. *Id.* In it, he stated that he had known Franklin (who had grown up in Englewood) for many years. *Id.* He also stated that he knew Petitioner from the neighborhood and that his nickname was "Man-Man." *Id.* According to Wright's statement, he was outside of a house at 56th and Winchester when he saw a "brownish" sedan driving down 56th Street. *Id.* Man-Man was driving, and another individual was in the passenger seat. *Id.* He looked at them and they looked at him. *Id.* About ten or twenty minutes later, Wright saw Man-Man drive past again. *Id.* He saw the car stop on 56th Street, just past Winchester. *Id.* Man-Man got out of the car and walked through some bushes, but he could not see if the passenger also got out. *Id.* Several minutes later, Wright heard five or six gunshots. *Id.* He ran into the house and looked out the window. *Id.* He heard tires squeal and saw the same car speed away down 56th Street. *Id.* Wright was also impeached with his grand jury testimony, which was substantively identical to his written statement. *Id.*

A second eyewitness, Darian Parker, was also subpoenaed by the prosecution. *Id.* at *2. Upon questioning, he testified that he was home on the night of the shooting, about a block from the house where Franklin's party was being held, and had no knowledge of what had occurred. *Id.* He admitted, however, that several months earlier—when he was in custody on a drug charge—he told police that he saw Petitioner shoot Franklin. *Id.* He also admitted at trial that he had identified Petitioner as the shooter from a photo array. *Id.* He further admitted that he had

3

provided a written statement to the police, and admitted to making some of the statements it contained but denied making any of the statements inculpating Petitioner. *Id.*

Parker was then impeached with his handwritten statement. *Id.* at *3. According to the statement he had given to police a few months after the shooting, Parker and Franklin were friends, and on the night in question Parker was walking to Franklin's birthday party. *Id.* When Parker turned onto Winchester Street, he saw Franklin sitting on the porch with two other people. *Id.* Parker then saw two men, known to him as Man-Man (who he identified as Petitioner) and Alton, appear from a gangway across the street. *Id.* Parker identified them in photographs and by name. *Id.* He knew Man-Man from the neighborhood and knew Alton from school. *Id.* When Man-Man and Alton reached the curb on the other side of the street, Man-Man pulled out a handgun, pointed it toward the porch where Franklin was, and fired at least four shots. *Id.* Parker then turned around and ran home, and later learned that Franklin had died from his gunshot wounds. *Id.* Parker was also impeached with his grand jury testimony, which was substantially the same as his handwritten statement. *Id.*

When confronted with these conflicting statements at trial, Parker claimed that he made the earlier statements because the police told him that they would drop his drug charge if he implicated someone in Franklin's murder. *Id.* However, upon further questioning by the prosecution, Parker acknowledged that he learned three days after his interview with police that the drug charge was not actually going to be dropped. In fact, he had already been sentenced on this charge when he testified before the grand jury in Petitioner's case. (R. 8-5, Trial Tr. at 203-04.) When asked if he had an explanation for why he continued with his story when testifying before the grand jury even though the charge was not dropped as the police allegedly promised

4

him, he responded, "No, sir."[2] (*Id.* at 210-11.) Parker also offered testimony in which he appeared to claim both that the police forced him to identify Petitioner as the shooter, and that he had not actually identified Petitioner as the shooter. (*Id.* at 198-99.)

In addition to these witnesses, one of the individuals sitting on the porch with Franklin corroborated several aspects of Spann's account, including the number of people on the porch and the direction the shots came from; however, she testified that she ran inside when she heard the first gunshot and never actually saw the shooter. (R. 8-5, Trial Tr. at 35-66.) Another individual who was upstairs at Franklin's birthday party testified that he looked out the second floor window when he heard the gunshots and saw a "dark, skinny guy with braids," between 5'5" and 5'7" tall, running down the gangway across the street.[3] (R. 8-9, Trial Tr. at 19-20.)

Following deliberations, the jury found Petitioner guilty of first-degree murder. *Carter,* 2011 WL 10068567, at *4. He was sentenced to 60 years in prison. *Id.* at *5. He appealed through appointed counsel from the Office of the State Appellate Defender, raising the following claims: (1) the trial court erred in admitting certain gang-related evidence at his trial; (2) the prosecutor made improper arguments during closing; (3) the trial court erred under state law in admitting the prior written statements of the recanting witnesses, Parker and Wright; and (4) his sentence was excessive. (R. 8-1, Pet'r's Br. at 21-65.) The Illinois Court of Appeals rejected these arguments and affirmed Petitioner's conviction and sentence in all respects. *Carter,* 2011

---

[2] As one of the prosecutors described it during closing argument, there was a long pause before Parker's answer. The prosecutor stated: "Tom [the other prosecutor] posed that series of questions to him, well, if it wasn't true and you were only saying these things initially because the police offered you this deal, then why tell the State's Attorney after you knew you had been lied to, why tell the Grand Jurors? And you remember he sat there, and he just sat there, and he just looked at Tom. It must have gone on for 20 seconds before, I don't remember if it was Tom or the judge asked him are you okay? It was like he was catatonic." (R. 8-10, Trial Tr. at 30.)

[3] This matched Petitioner's general description at the time of his arrest. (*See* R. 8-4, Arrest Report at 14 (listing Petitioner as a black male, 5'6" tall, 130 lbs., with a "Braids Hair Style").)

5

WL 10068567, at *5-10. Petitioner filed a petition for leave to appeal ("PLA") to the Illinois

Supreme Court, again through the State Appellate Defender, raising only one claim: That the

trial court erred under state law in admitting the prior statements and grand jury testimony of the

recanting witnesses. (R. 8-2, PLA at 32-51.) The petition was denied. *People v. Carter*, 968

N.E.2d 83 (Table) (Ill. Mar. 28, 2012.) Petitioner did not seek certiorari with the U.S. Supreme

Court. (R. 1, Pet. at 2.)

In January 2013, Petitioner filed a *pro se* petition for post-conviction relief with the state

trial court raising the following claims: (1) trial counsel was ineffective on various grounds; (2)

appellate counsel was ineffective on various grounds; (3) he was denied a fair trial based on the

trial court's admission of the "false" testimony of Parker and Wright in the form of their prior

sworn statements and grand jury testimony; and (4) he is actually innocent of the offense. (R. 8-

2, Trial Ct. Order at 90-109.) In support of his claims, he submitted affidavits prepared by Parker

and Wright in August 2012. (*Id.* at 96.) Parker attested that he made the statements inculpating

Petitioner in exchange for leniency in his drug case, and that the police officers told him what to

say. (*Id.*) Wright attested that a police officer told him what to say in his initial statement, and

that the officer pressured him into inculpating Petitioner by telling him that if he did not

cooperate "things would start to happen to me and my family that I would regret." (*Id.*) The trial

court denied the post-conviction petition. (*Id.* at 109.)

Petitioner appealed, again through the State Appellate Defender, raising one claim: that

he was denied a fair trial because the state relied on "false" testimony from Parker and Wright in

the form of their prior statements to police and grand jury testimony. (R. 8-2, Pet'r's Br. at 60-

78.) The Illinois Court of Appeals rejected this claim and affirmed the denial of post-conviction

relief. *Carter*, 2015 WL 4606082, at *4-5. Petitioner filed a *pro se* petition for rehearing, arguing

6

that the appellate court had erred in denying his claim. (R. 8-3, Pet. for Rehearing at 36-43.) The petition was denied. (R. 8-3, Ill. App. Ct. Order at 44.) Petitioner then filed a *pro se* PLA to the Illinois Supreme Court reiterating his false-testimony claim. (R. 8-3, PLA at 45-63.) The petition was denied. *People v. Carter*, 48 N.E.3d 673 (Table) (Ill. Jan. 20, 2016).

Thereafter, Petitioner filed his federal petition. (R. 1, Pet.) Liberally construing the petition, he raises the following claims: (1) the trial court erred by admitting certain gang-related evidence at his trial that was more prejudicial than probative; (2) the prosecutor made improper remarks during closing argument; (3) the trial court erred under state law in admitting the prior inconsistent statements of Wright and Parker; (4) his sentence was excessive; (5) his trial counsel was ineffective on various grounds; (6) his counsel on direct appeal was ineffective on various grounds; (7) the trial court erred in denying a post-trial motion; (8) he was denied a fair trial because Parker and Wright "provided false and misleading testimony before the grand jury with the full knowledge of the state's attorney"; and (9) the affidavits of Parker and Wright prove that he is actually innocent of the offense.[4] (R. 1, Pet. at 7-92.)

Respondent has answered the Petition, arguing that Petitioner's claims are non-cognizable on federal habeas review, procedurally defaulted, or otherwise without merit. (R. 7, Answer at 6-14.) Petitioner filed a one-page reply stating that he "stands entirely upon his original pleadings." (R. 13, Pet'r's Reply at 1.)

---

[4] For clarity of the record, the Court notes that these claim numbers were assigned by the Court, not Petitioner. The petition consists of 181 pages of arguments and exhibits, and in places is convoluted; the Court has attempted to reorder and group Petitioner's claims where appropriate. As to claims one through four, Petitioner states that he is reasserting the four claims raised by his appointed counsel on direct appeal. (R. 1, Pet. at 7.) He then provides a verbatim copy of the argument section of counsel's brief. (*See id.* at 8-28.) Petitioner further states that he is reasserting the claims contained in his state post-conviction petition; these claims have been grouped as claims five through nine. (*See id.* at 29-92.)

7

## LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), habeas relief cannot be granted with respect to any claim adjudicated on the merits by a state court, unless the state court's determination:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Under this deferential standard, the Court must "attend closely" to the decisions of the state courts and "give them full effect when their findings and judgments are consistent with federal law." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). Clearly established federal law for purposes of AEDPA means the holdings of the Supreme Court, not Supreme Court dicta or decisions of the Courts of Appeals. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) ("AEDPA permits habeas relief only if a state court's decision is contrary to, or involved an unreasonable application of, clearly established Federal law as determined by [the Supreme Court], not by the courts of appeals." (internal quotation marks omitted)); *see also Williams*, 529 U.S. at 365 (observing that "clearly established Federal law . . . refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision" (internal quotation marks omitted)).

The Supreme Court has held that a state court decision is contrary to clearly established federal law "if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). However, the state court need not cite to—or even be aware of—controlling Supreme Court cases, "so long as neither the reasoning nor the

8

result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court can grant habeas relief under the "unreasonable application" clause if the state court identifies the correct legal principle from Supreme Court precedent but unreasonably applies that principle to the petitioner's case. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). The state court's decision must be more than incorrect or erroneous; it must be "objectively unreasonable." *Id.* at 520-21. This is because federal habeas relief was intended to serve only as a "guard against extreme malfunctions in the state criminal justice systems," and not as "a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (citation omitted). To obtain relief, a petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. A state court's factual findings are considered unreasonable only if they "ignore[] the clear and convincing weight of the evidence." *Jean-Paul v. Douma*, 809 F.3d 354, 360 (7th Cir. 2015) (citation omitted).

Before considering the merits of a claim contained in a federal habeas petition, the Court must ensure that the petitioner has exhausted all available remedies in the state courts. 28 U.S.C. § 2254(b)(1)(A); *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004). The exhaustion requirement promotes comity by affording the state courts the first opportunity to address and correct violations of their prisoners' federal constitutional rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999); *Perruquet v. Briley*, 390 F.3d 505, 513-14 (7th Cir. 2004). For that opportunity to be meaningful, the petitioner must "fairly present" his federal constitutional claims in one complete round of state review. *Boerckel*, 526 U.S. at 845, 848. To do so, the petitioner must "present both the operative facts and the legal principles that control each claim" at each level of state review. *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007) (citation

omitted). This includes presenting the claim in a petition for discretionary review with the Illinois Supreme Court. *Boerckel*, 526 U.S. at 845-47. The companion procedural default doctrine, also rooted in comity concerns, precludes the Court from reaching the merits of a federal constitutional claim when: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground; or (2) the claim was not presented to the state courts and it is clear that the claim would now be procedurally barred under state law. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Perruquet*, 390 F.3d at 514.

A habeas petitioner can overcome a procedural default if he establishes both cause for failing to properly present a claim in state court and a resulting prejudice. *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977). Cause sufficient to excuse a procedural default is defined as "some objective factor external to the defense" that prevented a petitioner from pursuing his constitutional claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Prejudice in this context "means an error which so infected the entire trial that the resulting conviction violates due process." *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (citation omitted). A habeas petitioner can also overcome a procedural default by establishing that the Court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *Coleman*, 501 U.S. at 750. Under this narrow exception, the petitioner must establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citation omitted).

## ANALYSIS

### I.    Claim One

In his first claim, Petitioner asserts that the trial court erred in admitting certain gang-related evidence at his trial that was more prejudicial than probative. (R. 1, Pet. at 8-17.)

Respondent argues that this claim is not cognizable on federal habeas review. (R. 7, Answer at 6-7.) The Court agrees. Petitioner's claim is based on state law, (*see* R. 1, Pet. at 8-17), and violations of state law are not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas relief is only available for a violation of the U.S. Constitution or other federal laws); *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015) ("[A] federal court may not issue the writ on the basis of a perceived error of state law." (citation and internal quotation mark omitted)).

Even if the petition could be read to allege a federal claim, Respondent alternatively argues that any such claim is procedurally defaulted. (R. 7, Answer at 7.) The Court again agrees. To properly exhaust a claim in state court, a habeas petitioner must "present both the operative facts and the legal principles that control each claim." *Suh v. Pierce*, 630 F.3d 685, 690 (7th Cir. 2011) (citation omitted). This includes alerting the state court to the "federal nature" of the claim. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Petitioner did not do that here, as the claim he presented to the Illinois Court of Appeals was based entirely on state law. (R. 8-1, Pet'r's Br. at 44-53.) Additionally, Petitioner did not include any claim based on the admission of gang evidence in his PLA to the Illinois Supreme Court. (*See* R. 8-2, PLA at 34-35.) This is a necessary step for exhaustion purposes. *Boerckel*, 526 U.S. at 845. Because Petitioner did not present any federal claim based on the admission of this evidence in one complete round of state review, the claim is procedurally defaulted.

Petitioner may be arguing that errors by his appellate counsel should excuse his procedural default. (R. 1, Pet. at 34-42.) "Attorney error rising to the level of ineffective assistance of counsel can constitute cause to set aside a procedural default." *Wrinkles v. Buss*, 537 F.3d 804, 812 (7th Cir. 2008). However, the exhaustion doctrine requires that an ineffective-

11

assistance claim be presented to the state court as an independent claim before it can be used to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). If the ineffective-assistance claim was itself not properly presented in one complete round of state review, the petitioner is considered "fully defaulted." *Dellinger v. Bowen*, 301 F.3d 758, 766-67 (7th Cir. 2002). A review of the record shows that Petitioner did not assert a claim of ineffective assistance of counsel in one complete round of state review. Although he did raise certain claims of ineffective assistance in the post-conviction petition he filed with the trial court, (*see* R. 8-2, Trial Ct. Order at 93-105), he did not raise any such claim at either level of appellate review. (*See* R. 8-2, Pet'r's Br.; R. 8-3, PLA.) Because he did not independently exhaust this claim, and presents no reason to excuse this second level of default, he cannot assert ineffective assistance of counsel to excuse his procedural default. *Edwards*, 529 U.S. at 451.

Petitioner also asserts in his petition that he is actually innocent, and under appropriate circumstances, actual innocence will permit the Court to review a defaulted claim. *House*, 547 U.S. at 536. This is a difficult standard to meet, however, and a habeas petitioner who asserts actual innocence "must *demonstrate* innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict." *Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003). In this context, "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (internal quotation marks omitted). Thus, a claim of actual innocence must be supported by "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324; *see also Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) (observing that to show actual innocence a petitioner "must have documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who placed him out of

the city, with credit card slips, photographs, and phone logs to back up the claim"). The petitioner must demonstrate that in light of this new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. In deciding a claim of actual innocence, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under the rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (citation and internal quotation marks omitted). "Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* (citation and internal quotation marks omitted). This standard is a "demanding" one that can be met only in "extraordinary" circumstances. *Id.*; *see also McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013).

In support of his actual innocence claim, Petitioner points to the affidavits of Parker and Wright that he submitted in the state post-conviction proceeding. (R. 1, Pet. at 114-16.) As outlined above, Wright attests in that affidavit that he lied to police and also lied to the grand jury when he claimed that he saw Petitioner commit the shooting; he attests that he only implicated Petitioner because the police told him that if he did not cooperate, "things would start to happen to me and my family that I would regret." (*Id.* at 114.) He states that the police officers told him "what to say and what to write, and I did what I was told." (*Id.*)

Notably, the trial record reflects that Wright had a personal connection to Petitioner, *see Carter*, 2011 WL 10068567, at *1, and the Supreme Court has observed that evidence from eyewitnesses with "no evident motive to lie" is far more convincing than "testimony from inmates, suspects, or friends or relations of the accused" in connection with a claim of actual innocence. *House*, 547 U.S. at 552. It is also notable that Wright's affidavit was prepared in August 2012—more than two years after Petitioner's January 2010 trial ended—even though the

13

facts within it were obviously known to him at the time of trial. Wright testified under oath at Petitioner's trial that he "just blacked out" on the night of the shooting and had absolutely no recollection of what occurred, no recollection of making the statement to police inculpating Petitioner, and no recollection of testifying consistently with that statement before the grand jury. (R. 8-5, Trial Tr. at 101-121.) It strains credulity to believe that Wright somehow regained his memory of these events years after the trial, and he offers no explanation for this glaring discrepancy. *See McDowell v. Lemke*, 737 F.3d 476, 484 (7th Cir. 2013) ("'[E]leventh hour' affidavits, containing facts not alleged at trial and accompanied by no reasonable explanation for the delay are inherently suspect." (citation omitted)).

Wright claims in his affidavit that he "did all [he] could" to alert the jury at Petitioner's trial that his prior statements were the result of police coercion, but, in his words, "nobody really wanted to hear me." (R. 1, Pet. at 114.) This assertion is not borne out by the record. Wright was questioned at length by both the prosecutor and defense counsel about his prior statements inculpating Petitioner, including being asked directly about his interactions with police, and at no time did he say that his statements were coerced. (*See* R. 8-5, Trial Tr. at 100-42.) He was specifically asked if anyone forced him to implicate Petitioner and he replied, "Anybody force me? I don't remember." (*Id.* at 132.) At one point in his testimony he made a vague reference to "harassments" by the police, which caused the prosecutor to ask several follow-up questions. (*Id.* at 132-33.) The prosecutor asked Wright if the police were harassing him at the time he gave his statement, to which he replied, "No." (*Id.* at 133.) The prosecutor then asked if the police had harassed him into making the statement, threatened him in any way, or promised him something in exchange for his statement. (*Id.*) To each question Wright responded, "I don't remember." (*Id.*) If Wright feigned a lack of memory at trial because he was afraid of repercussions by the

14

police, he has not explained what changed after the trial to make him decide to go public with this information. Under these circumstances, his affidavit is highly suspect.

As for Parker, the record reflects that he too had a personal connection to Petitioner.[5] *Carter*, 2011 WL 10068567, at *3. He attests in his affidavit that he "never saw Carter or Spann since I was not there," and that the police "forced me to lie by signing a false statement and [lie] to the Grand Jury" in order to "get a deal on my drug case." (R. 1, Pet. at 115.) This is essentially the same as his trial testimony: Parker testified that he was at home the entire night and did not witness the shooting, and that he falsely implicated Petitioner so that his drug charge would be dismissed.[6] *Carter*, 2011 WL 10068567, at *2.

Because the information contained in Parker's affidavit was presented to the jury at Petitioner's trial, it does not meet the threshold requirement of being "new." *Schlup*, 513 U.S. at 324; *see also Watkins v. Hammers*, No. 14 C 1346, 2015 WL 5675605, at *8 (N.D. Ill. Sept. 24, 2015) (evidence offered in support of petitioner's "long-standing position that his confession was coerced" could not be considered "new" for purposes of actual innocence claim). As the Illinois Court of Appeals put it, Petitioner's jury "was already presented with the choice the affidavits

---

[5] It is unclear what connection exists between Wright and Parker, but it is worth noting that their affidavits bear striking similarities, contain certain identical language, and were signed and notarized by the same notary on the same day. (R. 1, Pet. at 114, 115-16.)

[6] Although the trial court did not permit this evidence to be heard by the jury, the state had evidence that Petitioner told Spann during a pretrial proceeding that Parker had "been paid off." (R. 8-7, Trial Tr. at 4-5.) Petitioner also allegedly told Spann that he had spoken to the father of another witness—a man housed on the same tier of his jail—and that the man was going to "make sure [his daughter] doesn't testify or [] knows what she has to do." (*Id.* at 4.) The witness, Kinesha Richardson, initially gave police a statement inculpating Petitioner, but at trial she testified that she did not actually see anything and instead simply "repeated back" what the police officers told her. (R. 8-6, Trial Tr. at 3-18.) Another eyewitness, Darlene Sosa, also gave a statement to police inculpating Petitioner after the shooting, but when subpoenaed by the prosecution at trial, she too professed a total lack of memory about the events of that night; she frequently interrupted the prosecutor to respond, "I don't remember," even before the prosecutor's question was completed. (*Id.* at 30-63.) At one point she went so far as to claim that she did not remember what her own signature looked like. (*Id.* at 39.) A review of the entire trial record gives the unfortunate impression that witness-tampering occurred in this case, whether through intimidation, bribery, or other means.

present: accepting [Parker's and Wright's] earlier sworn accounts implicating [Petitioner] or their later sworn accounts that they did not see the shooting." *Carter*, 2015 WL 4606082, at *4. The jurors had the opportunity to see these witnesses firsthand and assess their credibility, and they voted to convict. There is little basis in the record to conclude that no reasonable juror would convict Petitioner if presented with additional recantations by these same witnesses. *See House*, 547 U.S. at 538.

In any event, even if the affidavits are accepted as true, they do not establish that Petitioner is actually innocent. These witnesses do not attest that they saw someone else commit the murder, provide Petitioner with a plausible alibi defense, or offer other "powerful" evidence that would draw Petitioner's guilt into serious question. *See Hayes*, 403 F.3d at 938. At most, the affidavits establish that Parker and Wright do not know what happened because they were not there. Their statements do not undercut Spann's testimony or the other evidence of Petitioner's guilt, and thus fail to establish his factual innocence of the crime. Accordingly, the Court cannot reach claim one on the merits, even if it presents a cognizable claim.

## II.    Claim Two

In claim two, Petitioner asserts that the prosecutor made improper statements during closing arguments. (R. 1, Pet. at 11-16.) Respondent argues that this claim is procedurally defaulted. (R. 7, Answer at 7.) The Court agrees. As explained above, Petitioner was required to exhaust his claim by presenting it in one complete round of state review. *Boerckel*, 526 U.S. at 845. A review of the record reveals that he did not do so. Although he raised a prosecutorial misconduct claim on direct appeal in his brief filed with the Illinois Court of Appeals, (R. 8-1, Pet'r's Br. at 47-52), he did not include this claim in his PLA. (*See* R. 8-2, PLA at 34-35.) Because he did not assert this claim in one complete round of state review, it is procedurally

16

defaulted. *Boerckel*, 526 U.S. at 845. To the extent Petitioner is asserting ineffective assistance of counsel or actual innocence to excuse his default of this claim, those arguments fail for the same reasons articulated above.

### III. Claim Three

In claim three, Petitioner asserts that the trial court erred under state law in admitting the prior statements and grand jury testimony of Parker and Wright. (R. 1, Pet. at 18-23.) Respondent argues that this claim is not cognizable on federal habeas review. (R. 7, Answer at 6.) The Court agrees. This claim, like claim one, is premised on state law, and a violation of state law cannot form the basis for granting federal habeas relief. *Estelle*, 502 U.S. at 67-68.

Even if the petition could be read to allege a federal claim, Respondent alternatively argues that the claim is procedurally defaulted. (R. 7, Answer at 8.) The Court agrees. A claim is procedurally defaulted if it was presented to the state courts but denied on the basis of an "adequate and independent" state procedural ground. *Coleman*, 501 U.S. at 735; *see also Richardson v. Lemke*, 745 F.3d 258, 268 (7th Cir. 2014). The record here shows that Petitioner presented a claim regarding the admission of this evidence on direct appeal, but he conceded to the Illinois Court of Appeals that he did not properly preserve this claim for appellate review. *Carter*, 2011 WL 10068567, at *9; *see also People v. Enoch*, 522 N.E.2d 1124, 1130 (Ill. 1988) (holding that under Illinois law, both a trial objection and a written post-trial motion raising the issue is required to preserve a trial error for appellate review). The Illinois Court of Appeals reviewed Petitioner's claim for plain error and, finding none, determined that it "must honor [Petitioner's] procedural default." *Carter*, 2011 WL 10068567, at *9.

The procedural default finding by the state court constitutes an adequate and independent state ground that bars federal review. *Richardson*, 745 F.3d at 268-69 ("[W]hen a state court

refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules (i.e., because the petitioner failed to contemporaneously object), that decision rests on independent and adequate state procedural grounds." (citation omitted)); *Franklin v. Gilmore*, 188 F.3d 877, 881 (7th Cir. 1999) (holding that a habeas petitioner's failure to present his claims at the time and in the manner required by state law is an independent state ground that prevents review in federal court). The state court's plain-error review of Petitioner's claim does not alter this result. *See Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005) ("[A]n Illinois court does not reach the merits of a claim simply by reviewing it for plain error. Consequently, the plain-error analysis engaged in by the appellate court did not cure [the petitioner's] default."). Accordingly, this claim is procedurally defaulted. To the extent Petitioner is asserting ineffective assistance of counsel or actual innocence to excuse his default of this claim, those arguments fail for the same reasons articulated above.

**IV.     Claim Four**

In claim four, Petitioner asserts that his sentence was improper because the trial court failed to consider certain mitigating factors, and failed to comply with the state law requirement that a sentence be geared toward "restoring the offender to useful citizenship." (R. 1, Pet. at 24-28.) Respondent argues that this claim is also non-cognizable because it is based on alleged violations of state law. (R. 7, Answer at 6.) The Court agrees. *See Estelle*, 502 U.S. at 67-68.

Even if Petitioner could overcome this hurdle, Respondent alternatively argues that the claim is procedurally defaulted. (R. 7, Answer at 7.) As explained above, Petitioner was required to exhaust his claim by presenting it in one complete round of state review. *Boerckel*, 526 U.S. at 845. A review of the record reveals that he did not do so. Although he raised a claim challenging his sentence in his brief filed with the Illinois Court of Appeals on direct appeal, (R. 8-1, Pet'r's

18

Br. at 60-64), he did not include this claim in his PLA. (*See* R. 8-2, PLA at 34-35.) Thus, the claim is defaulted. *Boerckel*, 526 U.S. at 845. To the extent Petitioner is asserting ineffective assistance of counsel or actual innocence to excuse his default of this claim, those arguments fail for the same reasons articulated above.

**V.     Claims Five and Six**

In claims five and six, Petitioner asserts multiple grounds of ineffective assistance by trial and appellate counsel. (R. 1, Pet. at 30-82.) Respondent argues that these claims are all procedurally defaulted. (R. 7, Answer at 7.) As discussed above, the record shows that Petitioner did not assert any claim of ineffective assistance of counsel in one complete round of state review. Although he did raise certain grounds of ineffective assistance of counsel in the post-conviction petition he filed with the trial court, (*see* R. 8-2, Trial Ct. Order at 93-105), he did not raise any ineffective-assistance claims at either level of appellate review in the post-conviction proceedings, (*see* R. 8-2, Pet'r's Br.; R. 8-3, PLA.) Thus, these claims are defaulted. *Boerckel*, 526 U.S. at 845. It is unclear if Petitioner is trying to assert that attorney error excuses his default, but Petitioner's default at the PLA level occurred when he was proceeding *pro se* and thus cannot be attributed to any error by counsel. (*See* R. 8-3, PLA.) Petitioner's *pro se* status also does not provide cause to excuse his default. *Smith v. McKee*, 598 F.3d 374, 385 (7th Cir. 2010) ("This court has specifically rejected the argument that a petitioner's *pro se* status alone constitutes cause in a cause-and-prejudice analysis."). To the extent Petitioner is asserting actual innocence to excuse the default of these claims, his argument fails for the reasons already explained.

19

## VI.  Claim Seven

In claim seven, Petitioner argues that the trial court violated his rights by limiting the scope of his counsel's impeachment of Spann. (R. 1, Pet. at 68-78.) Respondent argues that this claim is procedurally defaulted. (R. 7, Answer at 7.) A review of the record shows that Petitioner raised this claim in his state post-conviction petition, (R. 8-2, Trial Ct. Order at 104-05), but he did not raise the claim at either level of appellate review, (*see* R. 8-2, Pet'r's Br. at 73-78; R. 8-3, PLA at 45-63.) Because the claim was not raised in one complete round of state review, it is procedurally defaulted. *Boerckel*, 526 U.S. at 845. To the extent Petitioner is trying to assert ineffective assistance of counsel as cause to excuse his default, as stated above, Petitioner represented himself at the PLA level in the post-conviction proceedings, such that the omission of this claim cannot be attributed to attorney error. (*See* R. 8-3, PLA.) Nor has Petitioner established his actual innocence for the reasons already stated.

## VII.  Claim Eight

In claim eight, Petitioner asserts that his due process rights were violated because Parker and Wright "provided false and misleading testimony before the grand jury with the full knowledge of the State's Attorney." (R. 1, Pet. at 83.) In support, he points to the affidavits from these witnesses disavowing their grand jury testimony. (*Id.*) Respondent argues that the claim fails on the merits. (R. 7, Answer at 10-11.)

The Illinois Court of Appeals considered this claim on post-conviction review and concluded that Petitioner's rights were not violated. *Carter*, 2015 WL 4606082, at *4. Petitioner does not assert that the state court's resolution of this claim involved an unreasonable determination of fact. To obtain relief under Section 2254(d)(2), Petitioner must establish that the state court's resolution of this claim was contrary to or an unreasonable application of clearly

20

established federal law, as set forth by the Supreme Court in case law existing at the time of the state court's decision. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("State-court decisions are measured against this Court's precedents as of the time the state court renders its decision." (citation and internal quotation marks omitted)).

Petitioner cannot meet that standard. First, he has not established that the grand jury testimony of Parker and Wright was "false" for the reasons explained above. If anything, the record suggests that these witnesses lied at trial when they claimed to have no recollection or knowledge of the shooting. Petitioner also has not established that the prosecutor knew or had reason to know that the grand jury testimony of these witnesses was false, particularly since their testimony was fully consistent with their prior statements to police, and their contrary affidavits post-date their trial testimony by two years. *See Carter*, 2015 WL 4606082, at *2-3.

But more importantly, the Supreme Court has never held that "presentation of perjured testimony before a grand jury violates a criminal defendant's constitutional rights." *Magee v. Butler*, No. 14-CV-6879, 2015 WL 5951877, at *8 (N.D. Ill. Oct. 13, 2015); *see also United States ex rel. Brown v. Pierce*, No. 10 C 7359, 2012 WL 851519, at *4 (N.D. Ill. Mar. 13, 2012) ("There is no clearly established Supreme Court precedent providing state prisoners a due process right to be indicted by a grand jury solely on truthful testimony."); *United States ex rel. Changyaleket*, No. 07 C 1694, 2008 WL 5157976, at *5 (N.D. Ill. Dec. 8, 2008) ("[T]he Court could not find any Supreme Court authority supporting [the petitioner's] claim that a prosecutor's knowing presentation of false testimony to a grand jury violates a criminal defendant's constitutional rights."). The state court's decision thus cannot be considered contrary to or an unreasonable application of Supreme Court precedent. *Virsnieks v. Smith*, 521 F.3d 707, 716 (7th Cir. 2008). Put simply, "there can be no Supreme Court precedent to be contradicted or

21

unreasonably applied, and therefore no habeas relief, when there is no Supreme Court precedent on point."[7] *Id.* (citation and internal quotation marks omitted)). To the extent Petitioner is arguing that the state court erred under *state* law in connection with its ruling, (*see* R. 1, Pet. at 84), habeas relief does not lie for errors of state law. *Estelle*, 502 U.S. at 67-68.

## VIII.  Claim Nine

In his final claim, Petitioner asserts that the affidavits of Parker and Wright establish that he is actually innocent. (R. 1, Pet. at 87-88.) Respondent argues that this claim does not present a cognizable basis for granting federal habeas relief. (R. 7, Answer at 7.) The Court agrees. "'[A]ctual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993); *see also McQuiggin*, 133 S. Ct. at 1931 (explaining that the Supreme Court has not recognized actual innocence as a stand-alone claim on federal habeas review). The Court fully considered Petitioner's claim of actual innocence in assessing whether the Court should review his defaulted claims, but this claim does not present an independent basis for overturning Petitioner's conviction. In any event, the evidence he has submitted does not prove his actual innocence for the reasons already stated.

---

[7] Although unclear, Petitioner may be attempting to assert a claim under *Napue v. Illinois*, 360 U.S. 264 (1959), which held that a prosecutor's knowing use of false testimony *at trial* violates a defendant's Fourteenth Amendment due process rights. To establish a violation of *Napue*, a petitioner must show that: "1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury." *Ashburn v. Korte*, 761 F.3d 741, 757 (7th Cir. 2014) (citation omitted). Assuming Petitioner properly exhausted such a claim, he has not demonstrated an entitlement to relief. At best, Petitioner has established that there were inconsistencies in the various accounts of Parker and Wright, but "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Id.* (citation omitted). Under these circumstances, the state court's denial of this claim cannot be deemed an unreasonable application of *Napue*.

## IX.    Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, the Court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. To obtain a certificate of appealability, the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation and internal quotation marks omitted). When a claim is resolved on procedural grounds, a district court can grant a certificate of appealability "only when the proverbial reasonable jurist would find both the district court's procedural decision and the merits of the claim debatable." *Peterson v. Douma*, 751 F.3d 524, 530-31 (7th Cir. 2014). As is fully explained above, Petitioner's claims are not cognizable in this proceeding, are procedurally defaulted, or are otherwise without merit under AEDPA standards. Nothing before the Court suggests that reasonable jurists would debate the outcome of the Petition or find a reason to encourage Petitioner to proceed further. Accordingly, the Court declines to issue him a certificate of appealability.[8]

---

[8] Petitioner makes a passing request for an evidentiary hearing in his reply brief. (R. 13, Reply at 1.) This is not an ordinary civil case, and the Court's ability to take new evidence in support of the petition is strictly limited. *See* 28 U.S.C. § 2254(e)(2); *see also Cullen*, 563 U.S. at 186 ("Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so."). Petitioner does not specify what claim his request pertains to or what additional facts he seeks to develop, nor does he explain why he was unable to develop such facts in the state courts. *See* 28 U.S.C. § 2254(e)(2). Additionally, as outlined herein, all of Petitioner's claims are non-cognizable and/or procedurally defaulted with the exception of claim eight. As to that claim, the Court must look to the record as it existed before the state court to determine whether the court's decision was contrary to or an unreasonable application of Supreme Court precedent. *Cullen*, 562 U.S. at 182-82. Under these circumstances, an evidentiary hearing is not warranted.

## CONCLUSION

For the foregoing reasons, the petition (R. 1) is DENIED. Petitioner is DENIED a certificate of appealability.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: October _3_, 2016**